IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

Coyote Logistics, LLC,

|  | Plaintiff, | Case No. 1:18-cv-03788 |

v.

Michael L. Brown
United States District Judge

Mera Trucking, LLC,

Defendant.

_____/

## OPINION AND ORDER

Plaintiff Coyote Logistics, LLC moves for summary judgment on Count One of its complaint.[1] (Dkt. 38.) The Court grants that motion.

## I. Background

Plaintiff Coyote is a property broker that arranges transportation of freight by motor carriers in interstate commerce. (Dkt. 43 ¶ 1.) Defendant Mera Trucking, LLC is a for-hire motor carrier that worked with Coyote. (*Id.* ¶ 2.) In February 2017, Procter and Gamble ("P&G")

---

[1] Count One asserts a claim under the Carmack Amendment, 49 U.S.C. § 14706. Counts Two through Four assert claims for breach of contract, vicarious liability, and attorneys' fees. Plaintiff's motion appears to address only Count One.

contracted Coyote to arrange transportation of a cargo shipment from Pennsylvania to Massachusetts. (*Id.* ¶ 3.) Coyote hired Mera to transport the items. (*Id.*) Mera's driver was to pick up the shipment in Pennsylvania from P&G and deliver it the next day to a customer in Massachusetts. (*Id.* ¶ 18.)

Coyote's and Mera's contractual relationship was governed by an agreement called the Broker-Carrier Agreement. (Dkt. 38-15.) Under it, Mera agreed to assume "the same liability as that of a common CARRIER for full actual loss" subject to the Carmack Amendment.[2] (*Id.* at 5 § 9(A).) Mera also agreed that, if a sealed shipment arrived without the seal intact, it would be liable for "any shortage or damage claims" and that "the shipper [had] the right in its sole discretion to deem the entire shipment damaged, contaminated and unsalvageable, without the need for any inspection."[3] (*Id.* at 5 § 9(B).) The agreement stated that P&G

---

[2] The Broker-Carrier Agreement states, "[e]xcept as otherwise specifically provided in this Agreement, CARRIER agrees that in the transportation of all goods hereunder, it assumes the same liability as that of a common CARRIER for full actual loss, subject to the provisions of 49 U.S.C. § 14706 ('Carmack Amendment') and 49 CFR Part 370 (claim regulations)." (Dkt. 38-15 at 5 § 9(A).)

[3] The section states in full: "<u>Seal Integrity:</u> CARRIER agrees to maintain a continuous seal record during the time the trailer is in the custody and control of CARRIER. CARRIER agrees to have the seal verified and the

could make this decision "to protect its brands and prevent potentially contaminated goods from entering into the stream of commerce, regardless of any actual condition of the shipment which an inspection might have revealed." (*Id.*)  It further stated that, if P&G deemed the entire shipment unsalvageable, "the shipment [would] be considered totally damaged and worthless for all purposes and [Mera would] be liable for the full value of the shipment." (*Id.*)  Finally, the agreement provided that Mera would accept a bill of lading when picking up goods for transportation but that, if the terms and conditions of any bill of

---

seal number and condition of the seal noted on the bills of lading and/or delivery receipt.  CARRIER also agrees to notify [Coyote] immediately (at time of first discovery) if the seal integrity is broken.

    In the event a shipment that was sealed at origin arrives at the destination with a tampered seal or without the seal intact then;

        i. the CARRIER shall be liable for any shortage or damage claims with respect to such shipment and

        ii. the shipper shall have the right, in its sole discretion, to deem the entire shipment damaged, contaminated, and unsalvageable, without the need for any inspection, in order to protect its brands and prevent potentially contaminated goods from entering into the stream of commerce, regardless of any actual condition of the shipment which an inspection might have revealed, in which case, the shipment shall be considered totally damaged and worthless for all purposes and the CARRIER shall be liable for the full value of the shipment.  To the extent that this paragraph might conflict with 49 U.S.C. § 14706, this paragraph shall take precedence and said statute is considered waived."

(Dkt. 38-15 at 5 § 9(B).)

lading conflict with the Broker-Carrier Agreement, "the terms and conditions of [the Broker-Carrier Agreement would] govern and take precedence[,] except to the extent the Bill of Lading contains specific instructions directly from the Customer." (*Id.* at 4 § 6.)

P&G had a standard practice for tendering shipments to motor carriers. It prepared an order, loaded the order into a motor carrier's trailer, and created a bill of lading. (*Id.* ¶¶ 6–9.) The driver and a P&G security employee then inspected the loaded trailer to ensure the order was complete.[4] (*Id.* ¶ 8.) The driver and the security employee then signed the bill of lading, closed the trailer doors, and affixed a seal to the door to monitor whether anyone opened the trailer during transit. (*Id.* ¶ 10.)

The parties followed this process for the shipment at issue here. P&G tendered the cargo to Mera and provided a bill of lading. (Dkts. 38-16 ¶ 13; 43 ¶ 13.)[5] It was three pages long. (Dkt. 38-4.) Two pages

---

[4] Mera disputes whether a driver can actually determine if an order is complete. (Dkt. 43 ¶ 12.) It does not, however, suggest that is a relevant issue here or otherwise challenge Coyote's assertion as to goods included in the shipment. (*Id.* ¶ 36.) The sole issue is whether Mera is liable for the full value of those goods or some lesser amount.

[5] Neither Mera's driver nor P&G's employee signed the copy of the bill of lading included at summary judgment. (Dkt. 38-4.) Initially, the parties

had sections entitled "Special Shipping Instructions."  (*Id.* at 1–2.)  Both

were left blank.  (*Id.*)  On the third page, under a heading of "Terms,

Conditions And Limitations For Domestic U.S. Origin Shipments," the

bill of lading stated, "Shipper shall give Carrier credit for the reasonable

salvage value of any damaged product which Shipper does not authorize

Carrier to resell."[6]  (*Id.* at 3 § 4.)

---

made no issue about this or suggested P&G deviated from its normal practice.  (Dkts. 38-1 at 3–4; 42 at 9.)  In their summary judgment briefing, both parties agreed the copy of the bill of lading included in the record is the operative document and relied upon it in making competing arguments. (Dkt. 43 ¶ 13.) At oral argument, however, Coyote suggested (for the first time) that no evidence shows Mera actually received the bill of lading.  Coyote explained that Mera was unable to present a copy of the bill of lading during discovery and that only P&G maintained a copy. But, Coyote's summary judgment filing shows this issue is not in dispute. Indeed, P&G's Rule 30(b)(6) deponent confirmed that it issued the bill of lading to Mera at the time of the shipment and relied upon it in determining the loss it suffered as a result of Mera's failure to care for the cargo.  (Dkt. 38-3 at 7:16–8:3.)

[6]  The full section states, "[c]arrier agrees to hold Shipper fully indemnified against loss, damage of injury to all goods which Carrier receives from shipper for disposition to Shipper's order until same are signed for by the Consignee.  Except as otherwise provided herein, claims will be settled in compliance with regulations published in 49 CFR Part 1005.  If a shipment or any part thereof is lost, damaged or destroyed, Carrier shall pay to Shipper the price charged to its Customers for the kind and quantity of product lost, damaged, or destroyed and unless included in said price, all taxes, fees, and other charges which Shipper may have paid or may be required to pay or collect with respect to or measured by such a product or the manufacture, storage, distribution, transportation, or sale thereof, but Shipper shall give Carrier credit for

After completing the standard process in Pennsylvania, Mera's driver left with the cargo for Massachusetts. (Dkt. 43 ¶ 18.) The driver reported a tire blowout in Rhode Island, and Mera's owner (Kevin Mera) directed him to a repair shop. (*Id.* ¶ 19.) The driver, however, stopped responding to communications, and Mr. Mera flew to Rhode Island to investigate. (*Id.* ¶ 20.) He found the tractor-trailer at a motel with a broken seal and missing cargo. (*Id.* ¶¶ 21–23.) The Rhode Island State Police opened an investigation and found some of the missing items. (*Id.* ¶ 24.) Mr. Mera drove the trailer and recovered cargo to P&G's facility. (*Id.* ¶ 28.) P&G destroyed the remaining cargo because the seal had been broken, the cargo showed visible signs of tampering, and the integrity of the cargo could not be guaranteed.[7] (*Id.* ¶¶ 33–34.)

P&G billed Coyote $86,946.52 — the value of the items stolen and destroyed. (*Id.* ¶ 36.) Coyote asked Mera to pay P&G, but Mera refused. (*Id.* ¶ 37.) Coyote paid P&G that amount and received an assignment

---

the reasonable salvage value of any damaged product which Shipper does not authorize Carrier to resell." (Dkt. 38-4 at 3 § 4.)

[7] Mera claims the cases were intact and remained sealed. (Dkt. 43 ¶ 33.) The seal, however, does not refer to each individual package's seal, but to the seal on the tractor-trailer. (Dkts. 38-15 at 5 § 9(B); 43 ¶ 10.) The parties agree that the seal on the container was broken and some cargo stolen.

from P&G of any claim against Mera.  (*Id.* ¶ 38.)  Coyote then sued Mera asserting P&G's claims under the Carmack Amendment to the Interstate Commerce Act and for breach of the Broker-Carrier Agreement. Following discovery, Coyote moved for summary judgment on the Carmack Claim.

## II.   Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case."  *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The party moving for summary judgment bears the initial burden of showing a court, by reference to materials in the record, that there is no genuine dispute as to any material fact.  *Hickson Corp. v. N. Crossarm*

*Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  A moving party meets this burden merely by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.  The movant, however, need not negate the other party's claim.  *Id.* at 323.  In determining whether the moving party has met this burden, a court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion.  *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996).

Once the movant has adequately supported its motion, the nonmoving party then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Ultimately, there is no "genuine [dispute] for trial" when the record as a whole could not lead a rational trier of fact to find for the nonmoving party.  *Id.*  But "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48.  The

court, however, resolves all reasonable doubts in favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). Additionally, "[i]t is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

## III. Discussion

"The Carmack Amendment was adopted to achieve uniformity in rules governing interstate shipments, including the rules governing injury or loss to property shipped." *UPS Supply Chain Sols., Inc. v. Megatrux Transp., Inc.*, 750 F.3d 1282, 1285 (11th Cir. 2014). It makes a carrier strictly liable for the non-delivery of or damage to goods tendered to it. *Id.* "When a shipper shows delivery of goods to a carrier in good condition and non-delivery or delivery in a damaged condition, there arises a prima facie presumption of liability." *Id.* at 1285–86.

There is no question that Coyote (asserting P&G's rights via the assignment) established a prima facie case of liability under the Carmack Amendment. The undisputed facts show P&G delivered the cargo to Mera in good condition, some of the cargo was stolen while in Mera's

9

possession, and the rest was delivered with a broken seal.  (Dkt. 43 ¶¶ 4, 21–24, 33.)  The issue in this case is the damages that Coyote (asserting P&G's claim) may recover.  It says it can recover the full value of the shipment while Mera says it is entitled to a credit against that amount for the "salvage value" of the cargo that it recovered but P&G decided to destroy.  The law says "[a] carrier of property in interstate commerce that loses a shipment is generally liable 'for the actual loss or injury to the property caused by' the carrier." *Megatrux Transp.*, 750 F.3d at 1286 (quoting 49 U.S.C. § 14706(a)(1)).  " 'Actual loss or injury' is ordinarily measured by any reduction in market value at the place of destination." *Id.*  Put differently, the general rule for determining the amount of damages "is the difference between the market value of the property in the condition in which it should have arrived at its destination and its market value in the condition in which it did arrive." *Gulf, Colo. & Santa Fe Ry. v. Tex. Packing Co.*, 244 U.S. 31, 37 (1917).

The Carmack Amendment, however, permits a carrier to limit its liability "to a value established by . . . written agreement between the carrier and shipper if that value would be reasonable under the circumstances surrounding the transportation."  49 U.S.C.

10

§ 14706(c)(1)(A).   In addition to an agreement to limit liability, the Carmack Amendment requires the carrier to provide "to the shipper, on request of the shipper, a written or electronic copy of the rate, classification, rules, and practices upon which any rate applicable to a shipment, or agreed to between the shipper and the carrier, is based." § 14706(c)(1)(B).  From this language, the Eleventh Circuit established a four-step inquiry for determining whether a carrier effectively limited its liability.  The carrier must "(1) maintain a tariff within the prescribed guidelines of the Interstate Commerce Commission, (2) give the shipper a reasonable opportunity to choose between two or more levels of liability, (3) obtain the shipper's written agreement as to the choice of liability, and (4) issue a receipt or bill of lading prior to moving the shipment."[8] *Megatrux Transp.*, 750 F.3d at 1286.

Mera concedes it did not comply with this process because, among other things, it never provided P&G an opportunity to select between two or more levels of liability.  Nevertheless, Mera says P&G agreed to limit its liability in the bill of lading by allowing a set-off for salvage value and

---

[8] The Eleventh Circuit has also recognized that statutes eliminating the Interstate Commerce Commission largely eliminated the first prong of this test.  *Megatrux Transp.*, 750 F.3d at 1286 n.3.

that this agreement must be enforced.  In support of its argument, Mera cites the Eleventh Circuit's opinion in *Siren, Inc. v. Estes Express Lines*, 249 F.3d 1268, 1271 (11th Cir. 2001).  In that case, the Court of Appeals enforced a limitation of liability contained in a shipper-prepared bill of lading even without direct evidence establishing the "reasonable opportunity to decide" prong of the test.  In doing so, the Court of Appeals held that the statute "requires nothing more than a valid written contract between the parties establishing a reasonable value for the purpose of limiting the liability of the carrier."  *Id.* at 1271.  *Siren* may not completely do away with the four-part test as Mera claims.  Rather, it relaxes the second prong when a shipper drafts a bill of lading by holding that a shipper's inclusion of a liability limitation in a bill of lading it drafts satisfies the "reasonable opportunity to decide" prong even when a carrier does not actually present other options.  *Id.* at 1270–71; *see also Werner Enters., Inc. v. Westwind Mar. Int'l, Inc.*, 554 F.3d 1319 (11th Cir. 2009) (holding shipper bound by limitation of liability in bill of lading drafted by intermediary when intermediary could have selected other liability limits).  Regardless of *Siren,* Mera cannot enforce the salvage-

value provision because it agreed not to do so and that agreement must be enforced.

There are two documents in this case that purport to establish Mera's liability for lost or damaged cargo — the bill of lading and the Broker-Carrier Agreement.   In the movement of goods in interstate commerce, it is not unusual to have competing or overlapping agreements between shippers, carriers, and their intermediaries.  In a series of cases, the Supreme Court and the Eleventh Circuit have explored how parties can limit their own liability and how those limitations impact other parties involved in the movement of goods.  In doing so, the courts have recognized that shippers are bound by liability limitations negotiated between their intermediary and a carrier.  In *Norfolk Southern Railway Co. v. Kirby,* 543 U.S. 14, 33 (2004), for example, the Supreme Court held that a downstream or "downchain" party need not investigate upstream contracts between the shipper and an intermediary.  A downstream party can assume the intermediary with which it deals has the right to negotiate a limitation of liability in carriage contracts.  *Id.*  So, when a downstream carrier issues or receives a bill of lading from an upstream carrier or broker that has a limitation of liability, it may enforce that

13

limitation against the shipper.  The shipper may be able to recover more from the party to whom it entrusted the cargo, but its recovery from the downstream carrier is limited to the scope of that carrier's agreement. The Supreme Court reached this decision, in part, to eliminate the need for carriers to investigate upstream agreements and parties.  *Id.* at 34–35.

In *Werner Enterprises*, the Eleventh Circuit applied that rule even when an intermediary did not negotiate a limitation of liability with its upstream counterpart.  554 F.3d at 1325.  The court repeated the Supreme Court's announcement that carriers "are entitled to assume that the party entrusted with goods may negotiate a limitation of liability." *Id.*  It explained that when an intermediary and a carrier agree to some limitation of liability that agreement limits the owner's recovery against the carrier.

Then, in *Megatrux Transportation*, the Eleventh Circuit considered whether a downstream carrier who negotiated for greater liability could take advantage of upstream agreements that limited liability.  The Court of Appeals said it could not.  750 F.3d at 1286–87.  The court reasoned that, just as a downstream carrier may enforce the limitations of liability

14

it negotiates, it must also honor the expanded liability it negotiates. *Id.* at 1287. The court explained "[t]he existence of liability limitations on the upstream contract between [the owner] and [the intermediary]—a contract that [the carrier] had no knowledge of or participation in—is irrelevant" to the carrier's liability. *Id.*

These cases establish a simple proposition that a carrier may set its liability through its dealings with a shipper or the shipper's intermediary but may not take advantage of limitations of liability to which it is not a party. In other words, a carrier may enforce its contractual protections but must also fulfill its contractual obligations. Underlying this is the recognition that carriers set their liability limitations in league with the rates they charge and shippers, likewise, accept rates based on the protection they require. *Id.* ("'[R]ate of freight is indissolubly bound up with the valuation' placed on the goods by the shipper.") (quoting *Hart v. Penn. R. Co.*, 112 U.S. 331, 337 (1884))*; see also Megatrux Transp.,* 750 F.3d at 1287 (recognizing that rate to which carrier agrees was "premised on full liability"); *Werner,* 554 F.3d at 1327 ("The carrier simply has the right to approve the request [to increased liability] and charge a correspondingly higher rate.").

Mera argues these principles require enforcement of the limited liability provision in the bill of lading.  It says that, since Coyote seeks to assert P&G's Carmack Claim and since P&G agreed to reduce any loss by the salvage value of any unsold product, Coyote must give it credit for the unsold product.  Mera says the Court would not protect P&G from its own decisions and thus cannot protect P&G's assignee from P&G's own decisions.

Mera misreads the two agreements at issue.  Mera established its liability in the Broker-Carrier Agreement.  It agreed that, if P&G deemed the entire shipment unsalvageable, any remaining cargo would be considered "worthless for all purposes" and Mera would "be liable for the full value of the shipment."  (Dkt. 38-15 at 5 § 9(B).)  It also agreed that the Broker-Carrier Agreement would control, "except to the extent the bill of lading contains specific instructions directly from the Customer." (*Id*. at 4 § 6.)  Mera argues the salvage-value provision in the bill of lading was a specific instruction that freed it from full-value liability.  (*Id*. at 3 § 4.)  The Court disagrees.[9]

---

[9] Whether the bill of lading's liability clause is a specific instruction is a question of contract interpretation.  The Broker-Carrier's choice of law clause states that Illinois law governs.[9]  (Dkt. 38-15 at 7 § 11(N).)  Under

The bill of lading's salvage-value provision is not a specific instruction. It is a statement of liability. The document is three pages long; two of the pages contain specific shipping information and the other page contains terms, conditions, and limitations. (Dkt. 38-4.) On each of the shipping information pages, there is a section titled "Special Shipping Instructions." (*Id.* at 1–2.) These sections are blank. Had the shipper (P&G) intended to provide specific instructions, it would have done so in those sections. In contrast, the salvage-value provision appears under the heading "Terms, Limitations, Liability for Domestic U.S. Origin Shipments" and among a larger provision discussing liability. (*Id.* at 3.) By its plain terms, the provision is a statement of liability rather than a specific instruction.[10] It thus conflicts with the greater liability provision in the Broker-Carrier Agreement and must give way.

---

Illinois law, courts apply a contract's plain meaning. *See Joyce v. DLA Piper Rudnick Gray Cary LLP*, 888 N.E.2d 657, 636–37 (Ill. App. Ct. 2008) ("The primary goal of contract interpretation is to give effect to the parties' intent by interpreting the contract as a whole and applying the plain and ordinary meaning to the unambiguous terms.").

[10] At oral argument, Mera took a slightly different position, arguing that the term "full value" as used in the liability provision of the Broker-Carrier agreement does not prevent it from claiming a credit for salvage value. It argued that, even though P&G deemed the product contaminated and unsellable, it still had some salvage value. Mera posited this argument in the hopes of avoiding any conflict between the

This outcome gives full effect to the parties' agreement. It also remains true to the underlying presumption that Mera set its rates based on the higher liability it accepted in the Broker-Carrier Agreement. The undisputed evidence shows that on February 8, 2017, Coyote issued Mera a Rate Load Confirmation for the shipment at issue. (Dkt. 47-2 at 14–16.) That document that gave Mera information on where to pick up the shipment, where to deliver it, and other relevant instructions. (*Id.*) It reaffirmed that the shipment was being provided pursuant to the terms of the Broker-Carrier Agreement. (*Id.* at 16.) It then set the rate that Coyote would pay for the shipment. (*Id.* at 15.) It also reaffirmed that the shipper had the right to deem any shipment with a broken seal unsalvageable, and if that happened, Mera could be liable for the full value of the shipment. (*Id.* at 14.) It even listed the value of the shipment as $100,000, well above the amount Coyote seeks here. (*Id.*)

Mera accepted the terms when it picked up the cargo. It did not obtain the bill of lading until after the truck was loaded. (Dkt. 43 ¶ 14.)

---

bill of lading and the Broker-Carrier Agreement. The liability provision, however, directly rejects its argument. It states that, if P&G deems the entire shipment unsalvageable, the shipment "shall be considered . . . worthless for all purposes." (Dkt. 38-15 at 5 § 9(B).) Worthless for all purposes negates any value from salvage.

By that time, Mera had already agreed to a rate that reflected the liability it accepted in the Broker-Carrier Agreement.  To enforce the salvage-value provision would give Mera a windfall — less liability than it agreed to incur.  It would also deprive Coyote of something it negotiated and paid for — its customer's right to declare the entire shipment unsalvageable.  And it would deprive P&G of its benefits as an intended (and named) beneficiary of the Broker Carrier Agreement.  (Dkt. 38-15 at 3 § 4(H).)[11]  Just as the carrier in *Megatrux Transportation* could not avoid full liability it negotiated with the intermediary in reliance on an agreement to which it was not a party, Mera cannot avoid full liability it negotiated with Coyote by relying on a subsequent bill of lading that it agreed not to rely upon.  750 F.3d at 1287.

Coyote has introduced undisputed evidence that the value of the cargo was $86,946.52.  (Dkt. 43 ¶ 53.)  Mera does not challenge this

---

[11] The Broker-Carrier Agreement provides that, to the extent there is a conflict with its provision that P&G may recover the full value of any shipment deemed a total loss and the Carmack Amendment, the contract governs and the statute is waived.  (*See* Dkt. 38-15 at 5 § 9(B) *("*To the extent that this paragraph might conflict with 49 U.S.C. § 14706, this paragraph shall take precedence and said statute is considered waived.").)  The parties do not argue "full value" damages exceed damages available under the Carmack Amendment.  But, if they did, the Court would enforce the waiver provision.

assertion.  That is the amount Coyote paid P&G for the cargo.  (Dkts. 38-13; 38-14.)  So, this is not a situation in which Coyote demanded a set-off for salvage value against P&G and is now denying the same to Mera.  Mera faces the exact liability to which it agreed, and Coyote seeks to enforce its contractual rights in order to recover its out-of-pocket loss.

In addition to arguing for a set-off for the cargo it claimed was undamaged, Mera also argues Coyote owes it $5000 related to three other invoices.  (Dkt. 42-1 at 44:16–45:13.)  Coyote claims to have paid $1600 of this amount and would allow the rest ($3400) subtracted from the damages award.  But those invoices do not relate to the dispute here, which is over the value of the cargo.  The claims over those three invoices are separate claims that the parties can deal with themselves or in a separate action.  The Court thus finds the value of the cargo, and the amount Mera owes Coyote under the Broker-Carrier Agreement, is $86,946.52.[12]

---

[12] Coyote seeks attorneys' fees and litigation costs in Count Four of the Amended Complaint.  Coyote, however, only moved for summary judgment on Count One.  Coyote can now move for summary judgment on Count Four, if appropriate.  Since the time for filing summary judgment motions has passed, the Court grants Defendant twenty days from the date of this order to file any such motion.

## IV.   Conclusion

The Court **GRANTS** Plaintiff Coyote's Motion for Summary Judgment (Dkt. 38) as to Count One of the Amended Complaint (Dkt. 17). The Court **ORDERS** Defendant Mera to pay Plaintiff Coyote $86,946.52.

**SO ORDERED** this 19th day of August, 2020.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE